# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

MINNESOTA LIFE INSURANCE COMPANY,

Plaintiff,

v.

BRIAN MICHAEL PHILPOT, et al.,

Defendants.

Case No. 11cv00812 BTM (POR)

**ORDER RE MOTIONS TO DISMISS**

Pending before the Court are the **motions to dismiss the Amended Complaint** filed by Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar (Doc. 42), Capital Funding Associates (Doc. 44), and Alvin Higa, Richard J. Wira, Rene Lacape, Equote, and Richard J. Wira and Yvette S. Wira as co-trustees of the Wira Family Trust (Doc. 46), the **motions to dismiss and to strike** filed by Samuel Brooks, Sarah Haber, Marketing Partnerships, Inc., Derrick Allen Moore, Brian Michael Philpot, Daniel Volsteadt, James Kenneth Willis, Michael Yolton, and James Kenneth Willis (Doc. 47), Beverly Ann Fletcher (Doc. 67), and Alex Almeida (Doc. 72), and the **motion to strike** filed by Defendants Scott Pearlman, Stan Pearlman, and Najjar (Doc. 43).

For the reasons set forth herein, the Court DENIES the motion to dismiss filed by Defendants Scott Pearlman, Stan Pearlman, Najjar, and the motions to dismiss and to strike filed by Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot, Volsteadt, Willis, Yolton, Fletcher, and Almeida. The Court GRANTS IN PART and DENIES IN PART the motions to

dismiss filed by Defendants Capital Funding Associates, Higa, Wira, Lacape, Equote, and Richard J. Wira and Yvette S. Wira as co-trustees of the Wira Family Trust.  The Court GRANTS the motion to strike filed by Scott Pearlman, Stan Pearlman, and Najjar.

## I.  BACKGROUND[1]

This case arises out Plaintiff Minnesota Life Insurance Company's allegations that Defendants perpetrated so-called "wrongful commission schemes."

Plaintiff (or "Minnesota Life") is an insurance company that provides, among other products, term and universal life insurance coverage.  Plaintiff sells its products through independent agents, most of whom are affiliated with a brokerage general agency.  (AC ¶ 34.)  The relationships between Plaintiff and its independent agents, and between Plaintiff and the brokerage general agencies, are governed by written agreements.  (Id. ¶¶ 35-39.)  Minnesota Life has appended to the Amended Complaint ("AC") copies of these written agreements.  (Id. Exs. A and B, respectively.)

Plaintiff compensates its independent sales agents on a commission basis.  (Id. ¶ 40.)  For each policy sold, the agents typically receive a commission of 80-125 percent of the total first year premium paid by the policyholder.  (Id. ¶ 41.)  These commissions are nonrecoverable by Plaintiff so long as the policyholders do not surrender the underlying policies and those policies do not otherwise lapse within the first year of issuance.  (Id. ¶¶ 41-42.)

In addition to the relatively large sales commissions, other costs incurred by Plaintiff upon the sale of new policies include marketing, underwriting, new business processing, premium taxes, and reinsurance.  Since Plaintiff must spend a proportionally large amount at the inception of a new policy, an early lapse or surrender of a policy causes Plaintiff significant financial loss.  (Id. ¶ 43.)

---

[1]The facts set forth in this section are taken from the Amended Complaint, and do not represent findings of the Court.

1      The goal of the alleged wrongful commission schemes is for independent agents and
2  brokerage general agencies to maximize their sales commissions.  To that end, the agents
3  and agencies persuade third parties to (a) to purchase life insurance policies; and (b) pay the
4  minimum premiums necessary to keep the policies in effect for one year, such that the
5  commissions paid by Plaintiff become vested.  To obtain policies for these third parties, the
6  agents and agencies prepare false life insurance applications on their behalf and send the
7  applications to Minnesota Life using instrumentalities of interstate commerce (wire and mail).
8  (Id. ¶¶ 47, 50.)

9      The agents and agencies induce third parties to participate in these schemes by
10  offering financial incentives, either in the form of "rebates" (a portion of the sales commission
11  that the agent or agency pays to the policyholder) or advances of the insurance premiums
12  due (such that the third parties receive discounted or free short term life insurance in return
13  for their participation).  (Id. ¶¶ 46-48.)  Where the third parties receive advances on their
14  premiums, the advances are sometimes funded by complicit entities ("funding entities") that
15  issue high-interest loans to cover the cost of the premiums.

16      In other words, the wrongful commission schemes allow the agents, agencies, third
17  parties, and funding entities, working together, to receive a profit on the margin between the
18  commissions they receive and the amount they spend to keep policies in effect for one year--
19  to the financial detriment of Minnesota Life.  The parties perpetrating these schemes act
20  "without any good faith intention . . . that the policies would actually be maintained or that the
21  applicable premiums would be paid, as those policies were designed or as the policies
22  required."  (Id. ¶ 47.)  Plaintiff alleges that it has paid a sum of over $4,434,375.25 in
23  commissions to all defendants in this case (including non-moving defendants) for policies
24  submitted pursuant to wrongful commission schemes.  (Id. ¶ 59)

25      Plaintiff alleges that the Defendants, all of whom are either sales agents or funding
26  entities, conspired with the other defendants in this action to perpetrate wrongful commission
27  schemes between 2009 and 2011.  Specifically, the individual defendants are sales agents.
28  Defendants Capital Funding Associates, Inc., and Richard J. Wira and Yvette S. Wira as co-

3

trustees of the Wira Family Trust (the "Wiras") are alleged funding entities.

Plaintiff has alleged ten causes of action: (1) unfair competition in violation of California Business & Professions Code § 17200, et seq.; (2) breach of contract; (3) breach of the covenant of good faith and fair dealing; (4) fraud; (5) negligence; (6) unjust enrichment; (7) violation of 18 U.S.C. § 1962(c) ("civil RICO") and 1962(d) ("RICO conspiracy"); (8) breach of fiduciary duty; (9) declaratory relief; and (10) accounting.

## II.  STANDARD

Under Fed. R. Civ. P. 8(a)(2), the plaintiff is required only to set forth a "short and plain statement" of the claim showing that plaintiff is entitled to relief and giving the defendant fair notice of what the claim is and the grounds upon which it rests. Conley v. Gibson, 355 U.S. 41, 47 (1957).  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) should be granted only where a plaintiff's complaint lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory. Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1988).

When reviewing a motion to dismiss, the allegations of material fact in plaintiff's complaint are taken as true and construed in the light most favorable to the plaintiff.  See Parks Sch. of Bus., Inc. v. Symington, 51 F.3d 1480, 1484 (9th Cir. 1995).  Although detailed factual allegations are not required, factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atlantic v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007).  "A plaintiff's obligation to prove the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not show[n] that the pleader is entitled to relief." Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1950 (2009) (internal quotation marks omitted).

4

1

**III.  DISCUSSION**

2

3          The Court groups the Defendants' various arguments by the cause of action they

4   address, and addresses each challenged cause of action in turn.

5

6   a.      Breach of contract

7

8          A claim for breach of contract under California law requires the plaintiff to establish

9   four elements: (1) the existence of a contract; (2) plaintiff's performance or excuse for

10  nonperformance of the contract; (3) defendant's breach of the contract; and (4) damages

11  resulting from defendant's breach of the contract.  Trovk v. Farmers Group, Inc., 171 Cal.

12  App. 4th 1305, 1352 (4th Dist. 2009).  Plaintiff asserts its claim for breach of contract against

13  all defendant insurance sales agents and brokerage general agencies.  These defendants

14  raise several challenges to Plaintiff's breach of contract theory.

15         First, **Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot,**

16  **Volsteadt, Willis, Yolton, Fletcher, and Almeida** claim that their contracts with Plaintiff

17  never went into effect, because they never signed *two* copies as required by express

18  language on the contract's signature page.  (Doc. 47-1 at 6 (citing AC Ex. B); Doc. 67-1 at

19  6 (same); Doc. 72-1 at 5-6 (same).)  They each support this argument with a declaration

20  swearing that they "signed only one copy of the Broker Sales Contract[.]"  (Doc. 47-7; Doc.

21  67-2; Doc. 72-2.)  The contents of these declarations, however, are not the proper subject

22  of judicial notice, and this argument--relying on facts not contained in the AC or in any

23  documents the AC relies on or attaches--is not properly raised in the context of a Rule

24  12(b)(6) motion.  See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th

25  Cir. 2001) ("[E]vidence outside the complaint . . . should not be considered in ruling on a

26  motion to dismiss.").

27         Second, **Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot,**

28  **Volsteadt, Willis, Yolton, Fletcher, and Almeida**, in addition to **Defendants  Higa, Wira,**

**Lacape, and Equote** and **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar**, claim that the practice of rebating portions of sales commissions to policyholders does not constitute a breach of any agreement with Plaintiff.  These defendants claim that the documents Plaintiff uses to show its policy against rebating (including Plaintiff's Policies and Procedures manual) either were not effective at the time the parties executed the contracts, or were not properly incorporated by reference into the contracts.  These defendants note that the only agreements requiring the signatories to abide by Plaintiff's policies and procedures are the agreements with the brokerage general agencies-- agreements to which the sales agent Defendants are not a party.  However, the breach of contract claim asserts breaches other than, and in addition to, the failure to abide by Plaintiff's policies and procedures.  For example, the contracts with the agents require the agents to "[c]onduct business according to the highest principles of honesty, integrity and pride" (AC ¶ 36), and prohibited them from "[k]nowingly provid[ing] false information on the applicants' application[s]" and from inducing any policyholder "to lapse or surrender the product" (id. ¶ 38).  Consequently, even if the contracts expressly *permitted* rebating, Plaintiff's breach of contract claim would survive.

Finally, **Defendants  Higa, Wira, Lacape, and Equote** claim that the AC failed to identify which specific agreements were breached.  This argument lacks merit.  Plaintiff attached to the AC copies of the agreement allegedly entered into by these defendants, and signature pages signed by them.  (Id. ¶ 36, Ex. B.)  That Plaintiff may have committed a clerical error by referring to the relevant agreement as a "Brokerage Agreement" in one part of the AC, and as a "Producer Agreement" in another, does not, as these defendants contend, render the breach of contract allegation fatally vague.

b.    Breach of covenant of good faith and fair dealing, breach of fiduciary duty, negligence

**Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot, Volsteadt, Willis, Yolton, Fletcher, and Almeida** argue that Plaintiff fails to state a claim

for a breach of the implied covenant of good faith and fair dealing because Plaintiff fails to allege the existence of a contract between the parties.  These defendants also argue that the absence of a contractual relationship means that they owe Plaintiff no duty (negligence) and no fiduciary duty (breach of fiduciary duty).  The Court rejects these arguments for the reasons set forth in the preceding section.

**Defendants  Higa, Wira, Lacape, and Equote** argue that their agreements with Plaintiff contain no prohibition against rebating and/or premium financing, and thus Plaintiff's claim that these practices violate the implied covenant of good faith and fair dealing impermissibly adds terms to those agreements.  **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar** also advance this argument, and repeat their argument that rebating and premium financing are legal in California.  As stated above, however, the Court is not persuaded at this stage that the operative contracts permitted rebating.  Moreover, Plaintiff's allegations that these defendants induced third parties to pay the minimum permissible premiums on a policy, such that these defendants could collect a commission at the known expense of Plaintiff, constitutes conduct that clearly undermines the purpose of the agency agreements, such that Plaintiff has properly stated a claim for breach of the implied covenant of good faith and fair dealing.

**Defendants  Higa, Wira, Lacape, and Equote** also argue that Plaintiff has failed to state a claim for negligence, because there is no duty to refrain from rebating.  However, Plaintiff has alleged that these defendants were its agents, and that they therefore "owed a duty to Minnesota Life to act as a reasonable sales agent in the life insurance industry and to not act in a manner contrary to Minnesota Life's business interests."  (AC ¶ 176.)  Any absence of a legal duty to refrain from the specific practice of rebating does not allow these defendants to escape Plaintiff's negligence claim at this stage.

**Defendant CFA**, the funding entity, challenges Plaintiff's negligence claim against it on the ground that CFA never entered any relationship with Plaintiff, contractual or otherwise, and therefore owed no duty.  The California Supreme Court has held that "[r]ecognition of a duty to manage business affairs so as to prevent purely economic loss to third parties in

their financial transactions is the exception, not the rule, in negligence law." <u>Quelimane Co. v. Stewart Title Guaranty Co.</u>, 19 Cal. 4th 26, 58 (1998).   However, under certain circumstances, California courts *will* impose such a duty.  For example, in <u>Connor v. Great Western Sav. & Loan Assn.</u>, 69 Cal. 2d 850 (1968), the court permitted home buyers to maintain a negligence claim against a construction lender defendant that negligently undercapitalized the construction of the buyers' homes, notwithstanding the fact that the buyer plaintiffs were third parties with respect to the defendant's contracts with the home builders.  The <u>Connor</u> court applied a six factor test:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant's conduct and the injury suffered, [5] the moral blame attached to the defendant's conduct, and [6] the policy of preventing future harm.

69 Cal. 2d at 865; <u>see</u> <u>also</u> <u>Quelimane</u>, 19 Cal. 4th at 58 (applying same test).  In this case, Plaintiff has alleged that CFA was controlled by Defendant Wira, that CFA knowingly enabled the wrongful commission schemes by financing them through usurious loans, and that it profited as a result.  (AC ¶¶ 197, 201, 205, 208, 211, 212.)  Under these circumstances, all six factors articulated by the court in <u>Connor</u> weigh in favor of Plaintiff.  The Court finds that Plaintiff has alleged sufficient facts to state a claim of negligence against Defendant CFA.

<u>c.</u>      <u>Violation of Unfair Competition Law</u>

California's Unfair Competition Law ("UCL") prohibits individuals and business organizations from engaging in any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.  Pursuant to the UCL, any "person who has suffered injury in fact and has lost money or property as a result of . . . unfair competition" may bring a civil action, and may seek relief in the form of injunctive relief, "restor[ation of] any money or property . . . which may have been acquired by means of . . . unfair competition," and civil

1  penalties.  Id. §§ 17203, 17204, 17206.  The UCL's "coverage is sweeping, embracing

2  anything that can properly be called a business practice and that at the same time is

3  forbidden by law."  Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180

4  (1999) (internal quotations and citation omitted).

5       The parties' briefs in all five motions to dismiss discuss at considerable length the

6  issue of whether California law prohibits rebating in the life insurance industry.  Specifically,

7  Defendants contend that Proposition 103, adopted by California voters in 1988, fully repealed

8  California Insurance Code § 750, and that prior to its repeal, § 750 was the only provision of

9  law barring rebating in the life insurance industry in California.  Consequently, Defendants

10  argue, there no longer remains any provision of law in California prohibiting the practice of

11  rebating.  Plaintiffs argue that Proposition 103 does not apply to the life insurance industry,

12  and therefore rebating in the life insurance industry remains illegal, notwithstanding the

13  repeal of § 750.  No California state court has weighed in on this issue, and other courts have

14  reached conflicting results.  Compare North American Co. For Life and Health Ins. v. Philpot,

15  et al., 08cv00270, slip op. at 4-5 (S.D. Cal. Feb. 17, 2009) (order denying motions to dismiss

16  and for a more definite statement) (holding, based on California cases stating in broad terms

17  that Proposition 103 does not apply to life insurance, that permissibility of rebating in life

18  insurance industry is "speculative at best"); with In re Prudential Insurance Co. of America,

19  CDI No. UPA 0053-AP et al. (Cal. Dep't of Ins. Sept. 8, 1994) (Doc. 44-2, Ex. 4) (finding that

20  Proposition 103 "remove[d] [§ 750's] statutory proscription against rebating" in all industries

21  except "those for which a separate prohibition remains in tact").

22       The Court declines to offer an opinion on this issue, because regardless of whether

23  rebating life insurance commissions to policyholders is legal, Plaintiff has stated a claim

24  against all defendants under the UCL.  The purpose of the UCL is "to foster and encourage

25  competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and

26  discriminatory practices by which fair and honest competition is destroyed or prevented."  Id.

27  § 17001.  The UCL "does more than just borrow" violations of other laws, since it also

28  prohibits business acts and practices that are unfair or unlawful, and therefore "a practice is

9

prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." <u>Cel-Tech</u>, 20 Cal. 4th at 180 (citation and quotation marks omitted).  The Court finds that the wrongful commissions scheme, as alleged, is both unfair and fraudulent, even if not outright unlawful.

"In permitting the restraining of all 'unfair' business practices, [the UCL] undeniably establishes only a wide standard to guide courts of equity; . . . given the creative nature of the scheming mind, the Legislature evidently concluded that a less inclusive standard would not be adequate."  <u>Id.</u>  The determination of whether a practice is unfair "involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer."  <u>Motors, Inc. v. Times Mirror Co.</u>, 102 Cal. App. 3d 735, 740 (2d Dist. 1980).  Plaintiff has alleged a business practice that causes a substantial injury, and is motivated purely out of a desire for maximizing commissions (rather than, for example, an effort to secure the best insurance coverage for policyholders). Moreover, Plaintiff has specifically alleged that the "cost of insurance for those products utilized by the Wrongful Commission Schemes are shifted to those honest policyholders who pay sufficient premiums to maintain their policies in force and[] who intend to keep their policies in force, as those products have been designed by . . . Minnesota Life." (AC ¶ 28.) Plaintiff has alleged in detail a practice that has no legitimate business motivation, that causes substantial direct injury to insurance companies such as itself, and that adversely affects other consumers in the life insurance market.  Thus, Plaintiff has stated a claim under the UCL.

The alleged wrongful commission schemes are also fraudulent within the meaning of the UCL.  As explained by the Court in <u>Morgan v. AT & T Wireless Services, Inc.</u>, 177 Cal. App. 4th 1235 (2d Dist. 2009):

> A UCL claim based on the fraudulent prong can be based on representations that deceive because they are untrue, but also those which may be accurate on some level, but will nonetheless tend to mislead or deceive.  A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL.

177 Cal. App. 4th at 1255 (citation, quotation marks, and alterations omitted).  Plaintiff has

10

alleged that Defendants deliberately took advantage of Plaintiff's assumption of a relatively low lapse rate for certain insurance products, and that Plaintiff issued the relevant policies as a result of misleading applications prepared by various Defendants.   Under these circumstances, Plaintiff has stated a claim for a fraudulent business practice under the UCL.

**Defendants  Higa, Wira, Lacape, Equote, Richard J. Wira and Yvette S. Wira as co-trustees of the Wira Family Trust (the "Wiras")**, as well as **Defendant Capital Funding Associates, Inc. ("CFA")** and **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar**, argue that disgorgement of profits is not a permissible remedy under the UCL.   Plaintiff seeks "[a]n order requiring Defendants to *disgorge* all of their ill-gotten commissions, and all of the profits and gains they have reaped."  (AC ¶ 71 (emphasis added).) The UCL permits only "restor[ation of] any money or property . . . which may have been acquired by means of . . . unfair competition."  Cal. Bus. & Prof. Code § 17203.  This remedy is characterized more appropriately as *restitution* rather than disgorgement.  The moving defendants argue that disgorgement of *all commissions* "without offsetting the premiums received by the Plaintiff . . . would result in a windfall[,]" and thus would not be restitutionary.   (Doc. 42-2 at 13.)   Defendants are correct that Plaintiff cannot seek "norestitutionary disgorgement" under the UCL.  See Korea Supply Co. V. Lockheed Martin Corp., 29 Cal. 4 th 1134, 1146-48 (2003).  However, the use of the term "disgorgement" is not fatal to Plaintiff's UCL claim.  Whether and to what extent disgorgement of commissions is an appropriate remedy under the UCL can be raised at a later stage.

**The Wiras and CFA**--the funding entity defendants--argue that premium financing is perfectly legal and is an accepted practice in the insurance industry.  However, the alleged financing is not typical "premium financing," as Plaintiff alleges that the policyholders themselves were never required to pay back the loans made by the funding entities. Moreover, even to the extent that the financing arrangement itself was legal, Plaintiff has alleged that the funding entities knowingly played a role in an overall practice that, as explained above, was both unfair and fraudulent.

1    d.    Fraud

2

3        The elements of a claim for fraud under California law are: (1) a misrepresentation (or

4    a failure to disclose by one who has a fiduciary duty to another), (2) of a material fact, (3)

5    scienter, (4) reliance, and (5) damages.  Alliance Mortgage Co. v. Rothwell, 10 Cal. 4th 1226,

6    1239 (1995).

7        Plaintiff has alleged the submission of "fraudulent applications" for life insurance

8    policies in which the sales agent Defendants affirmatively misrepresented to Plaintiff that the

9    applications were complete and that they "includ[ed] all of the material circumstances

10   surrounding the submission of such applications."  (AC ¶ 169.)  Plaintiff has alleged that

11   Defendants and the prospective policyholders intended to allow the policies to lapse after

12   making the minimum payment necessary to collect commissions, and that this plan is a

13   "material circumstance surrounding the submission of the applications."  Plaintiff has also

14   provided policy numbers for specific, allegedly fraudulent applications submitted by each

15   sales agent Defendant.   (Id. ¶¶ 152-168.)  Finally, Plaintiff has alleged that it issued the

16   policies on the basis of the misrepresentations in the applications, and that it suffered

17   damages. (Id. ¶ 59.)  Plaintiff has alleged fraud with sufficient particularity against the sales

18   agent Defendants.

19       None of the objections raised by the sales agent Defendants against the fraud claim

20   withstand scrutiny.  **Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore,**

21   **Philpot, Volsteadt, Willis, Yolton, Fletcher, and Almeida** all assert that neither the

22   intention of third parties to allow the policies to lapse nor the wrongful commission scheme

23   itself is a "fact" capable of being misrepresented.  The misrepresented "fact," however, is the

24   statement that the allegedly fraudulent applications contained all material circumstances

25   relevant to issuing the policy.  **Defendants  Higa, Wira, Lacape, and Equote** claim that

26   "Plaintiff failed to allege that there was a specific question in an insurance application that

27   required the disclosure" of the scheme, but again, this is demonstrably false.  (AC ¶ 169.)

28   **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar** argue that Plaintiffs have

1   failed to show "a duty to disclose that [these defendants] intended to finance premiums and

2   rebate commission to their clients."   This argument does not confront the substance of

3   Plaintiff's fraud allegations, as Plaintiff's allegations of fraud are not limited to the mere failure

4   to disclose the practices of rebating and premium financing.

5       **Defendant CFA** argues that it cannot be liable for fraud because "plaintiff does not

6   assert that any . . . contractual 'duty to disclose' applied to CFA."   (Doc. 44-1 at 10.)

7   However, Plaintiff has alleged that CFA was owned and controlled by Defendant Wira at the

8   times relevant to the alleged fraud (AC ¶ 9), that CFA participated in wrongful commission

9   schemes by serving as the "primary funding entity" for the other defendants' fraudulent

10   activity (id.), that CFA's funding activities "enabled and facilitated the success of the

11   Schemes" (id.), and that CFA acted knowingly and willingly (id. ¶ 151).   These allegations are

12   sufficient to state a claim for fraud against Defendant CFA under an aiding and abetting

13   theory, notwithstanding the absence of any *direct* relationship between CFA and Plaintiff.

14   See  Fiol v. Doellstedt, 50 Cal. App. 4th 1318, 1325-26 (2d Dist. 1996) ("Liability may . . . be

15   imposed on one who aids and abets the commission of an intentional tort if the person (a)

16   knows the other's conduct constitutes a breach of duty and gives substantial assistance or

17   encouragement to the other to so act or (b) gives substantial assistance to the other in

18   accomplishing a tortious result and the person's own conduct, separately considered,

19   constitutes a breach of duty to the third person.").   Accordingly, the Court denies Defendant

20   CFA's motion to dismiss the fraud claim.

21

22

23

24

25   e.   Civil RICO

26

27       A claim for a violation of 18 U.S.C. § 1962(c) requires (1) conduct (2) of an enterprise

28   (3) through a pattern (4) of racketeering activity.  Sedima, S.P.R.L. v. Imrex Co., Inc., 473

13

U.S. 479, 496 (1985).  "Any recoverable damages occurring by reason of a violation of §
1962(c) will flow from the commission of the predicate acts."  Id. at 497.  The predicate acts
of racketeering alleged in this case are mail and wire fraud.  (AC ¶¶ 47, 198.)

**Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot, Volsteadt, Willis, Yolton, Fletcher, and Almeida** raise two general objections to Plaintiff's § 1962(c) ("civil RICO") claim.  First, along with **Defendants Higa, Wira, Lacape, and Equote**, they essentially echo their objections to the fraud claim and assert that Plaintiff has not alleged mail and wire fraud with the requisite specificity, and therefore Plaintiff has failed to establish the "predicate act" element of its civil RICO claim.  However, Plaintiff lists dozens of specific, allegedly fraudulent policies that Plaintiff claims were sent through channels of interstate commerce, "through mail and/or over the wires."  (Id. ¶ 210.)

Second, they argue that Plaintiff has not alleged a sufficient causal connection between the predicate acts and the damages incurred.  This argument is nonsensical: Plaintiff alleges mail and wire fraud as the predicate acts, and alleges that the Defendants defrauded it directly, to its detriment.  These Defendants also claim that "there is no proximate cause because it is impossible to calculate the percentage of the alleged bonuses, commissions and underwriting costs that would be attributable to the alleged 'sham' policies, as opposed to those deriving from legitimate policies."  (See Doc. 47-1 at 18.)  This argument has nothing to do with proximate cause, and relates only to whether Plaintiff will be able to prove its damages.  To the extent these Defendants believe that certain relevant policyholders allowed their policies to lapse for legitimate reasons, they can attempt to establish that defense by presenting evidence at another stage in these proceedings.

**Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar** also raise two objections:  First, they argue that Plaintiff has failed to establish the "conduct" element of its civil RICO claim because the "the conduct it complains of is legitimate lawful activity."  (Doc. 42-2 at 18.)  The Court rejects this argument for the reasons set forth in the preceding sections.

//

Second, they argue that Plaintiff has failed to establish the "enterprise" element because it has not alleged an "'ascertainable structure' separate and apart from the alleged pattern of racketeering." (Id. at 19  (citing NSI Tech. Serv. Corp. v. Nat'l. Aeronautics and Space, No. Civ. 95-20559, 1995 WL 761266, at *3 (N.D. Cal. Dec. 15, 1995)).)  However, the legal authority relied on by these defendants is no longer good law in the Ninth Circuit. See Odom v. Microsoft Corp., 486 F.3d 541, 551 (9th Cir. 2007) (en banc) ("We . . . hold that an associated-in-fact enterprise under RICO does not require any particular organizational structure, separate or otherwise.").  Also, Plaintiff has specifically alleged that these three defendants were employed by Stan Pearlman d/b/a Terrace Insurance Services and regularly executed wrongful commission schemes under funding routinely provided by Defendant CFA.  (AC ¶¶ 3, 204-213.)  The AC sufficiently pleads the "enterprise" element against Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar.

**Defendant CFA** raises two arguments against the civil RICO claim that are based on its position as a funding entity for the schemes, rather than as a sales agent or brokerage agency.  First, CFA argues that the mere act of providing funding to the entity is not the type of participation sufficient to trigger liability under § 1962(c), because "one is not liable under that provision unless one has participated in the operation or management of the enterprise itself."  (Doc. 44-1 at 13 (quoting Reves v. Ernst & Young, 507 U.S. 170, 183 (1993)).) Second, and relatedly, CFA argues that there is no liability under § 1962(c) for "aiding and abetting" an enterprise.  **The Wiras** similarly argue that they played no direct role in the mail and wire fraud, and that the alleged secret loans cannot form the predicate act necessary to establish RICO liability.

These arguments, however, misapprehend the standard for "participation" in a RICO conspiracy.  In Salinas v. United States, 522 U.S. 52 (1997), the Supreme Court held that § 1962(c) applied to a sheriff's deputy that "knew about and agreed to facilitate a scheme" whereby the sheriff accepted bribes, even though the deputy himself never committed any predicate acts of bribery.  522 U.S. at 63-65.  The Salinas Court reasoned that "[i]f conspirators have a plan which calls for some conspirators to perpetrate the crime and others

to provide support, the supporters are as guilty as the perpetrators." <u>Id.</u> at 64.  Following <u>Salinas</u>, the Ninth Circuit confirmed that <u>Reves</u>' "operation or management" test is no longer good law, and that § 1962(c) applies to anyone who "knowingly agree[d] to facilitate a scheme which includes the operation or management of a RICO enterprise." <u>United States v. Fernandez</u>, 388 F.3d 1199, 1230 (9th Cir. 2004).

Plaintiff has alleged that CFA and the Wiras "conspired with and aided and abetted" the other defendants by knowingly providing essential economic support for the wrongful commission schemes--a scheme involving multiple alleged predicate acts of mail and wire fraud--and that CFA and the Wiras profited therefrom.  (AC ¶ 208.)  Under these alleged facts alone, Plaintiff has properly pled its civil RICO claim against CFA and the Wiras.  The Court notes, however, that Plaintiff has also alleged that the loans made by CFA and the Wiras were usurious, and that the loans themselves are also predicate acts.  (AC ¶ 211-212.) CFA and the Wiras do not address this allegation.

f.    Unjust Enrichment

**Defendants Higa, Wira, Lacape, and Equote**, in addition to **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar**, assert that there is no separate claim for unjust enrichment in California.  While this is true on a semantic level, "[u]njust enrichment is synonymous with restitution[,]" and "under the law of restitution, an individual is required to make restitution if he or she is unjustly enriched." <u>Durell v. Sharp Healtcare</u>, 183 Cal. App. 4th 1350, 1370 (4th Dist. 2010).

Regardless of whether Plaintiff titles this claim "Unjust Enrichment" or "Restitution," Plaintiff has stated a claim under California law.  Restitution does not require a predicate illegal act, and Plaintiff's claims, if true, suffice to establish entitlement to restitution, since Plaintiff has alleged that Defendants enriched themselves under circumstances that were clearly unjust.  <u>See</u> <u>McBride v. Boughton</u>, 123 Cal. App. 4th 379, 389 (1st Dist. 2004) ("The person receiving the benefit is required to make restitution . . . if the circumstances are such

1   that, as between the two individuals, it is unjust for the person to retain it.").

2       **The Wiras** assert merely that the facts alleged in the AC fail to support a claim for

3   unjust enrichment.  However, as stated above, Plaintiff has alleged that the Wiras knowingly

4   participated in a scheme with Plaintiff's agents to defraud Plaintiff, and profited from their

5   participation in that scheme.  The Court finds that Plaintiff has stated a claim for unjust

6   enrichment against the Wiras.

7

8   g.    Declaratory relief

9

10      **Defendants  Higa, Wira, Lacape, and Equote**, in addition to **Defendants Scott**

11  **Pearlman, Stan Pearlman, and Nissim Najjar**,  assert that the claim for declaratory relief

12  is moot, because Plaintiff terminated its business relationship with all Defendants in 2011.

13  The Court dismisses the claim for declaratory relief on other grounds; namely, that it is

14  redundant of Plaintiff's other claims.

15      "Declaratory relief may be unnecessary where an adequate remedy exists under some

16  other cause of action."  Concorde Equity II, LLC v. Miller, 732 F. Supp. 2d 990, 1002 (N.D.

17  Cal. 2010).   When claims for declaratory relief are duplicative of other claims, then

18  declaratory relief is therefore unnecessary and redundant.  Id. at 1003.  Plaintiff's declaratory

19  relief claim seeks "a declaration . . . that Defendants are liable for the damages suffered by

20  Minnesota Life due to their Wrongful Commission Schemes[.]"  (AC ¶ 222.)  Since Plaintiff's

21  entitlement to this relief will be resolved during the course of litigating its damages claims,

22  the Court dismisses Plaintiff's claim for declaratory relief as unnecessary and redundant.

23  See Chan v. Chancelor, No. 09cv1839, 2011 WL 5914263, at *6 (N.D. Cal. Nov. 28, 2011)

24  ("All of the issues in the declaratory judgment claim will be resolved by the substantive

25  action, so the declaratory judgment serves no useful purpose.").

26

27  h.    Accounting

28

17

**Defendants CFA, the Wiras, Higa, Wira, Lacape, and Equote** challenge this claim in particular.  The Wiras, Higa, Wira, Lacape, and Equote merely assert that Plaintiff cannot maintain a claim against them for an accounting because "none of the other purported causes of action . . . state a viable claim against defendants[.]" (Doc. 46-1 at 18.)  Similarly, **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar** argue for dismissal of this claim on the ground that "[w]hen a defendant owes no money to the plaintiff and did not deprive it of any monies, as a matter of law, an accounting cause of action must be dismissed." (Doc. 42-2 at 20.)  The Court rejects these arguments for the reasons set forth in the preceding sections.  **CFA** further claims that it has no relationship with Plaintiff, such as can support a claim for an accounting.  <u>See</u> <u>Teselle v. McLoughlin</u>, 173 Cal. App. 4th 156, 179 (3d Dist. 2009) ("A cause of action for an accounting requires a showing that a relationship exists between the plaintiff and defendant that requires an accounting.")  The Court finds it unnecessary to determine whether CFA and Plaintiff are sufficiently related to justify an accounting, since the claim for accounting fails on a separate ground:  Plaintiff has already calculated the amount it paid in wrongful commissions.

"An action for accounting is not available where the plaintiff alleges the right to recover a sum certain or a sum that can be made certain by calculation." <u>Id.</u>  Plaintiff specifically alleges that "Minnesota Life has paid over $4,434,375.25 in commissions to Defendants for the policies submitted pursuant to the Wrongful Commissions Schemes[.]" (AC ¶ 59.)  The other categories of damages sought by Plaintiff, including civil penalties and punitive and compensatory damages for losses incurred as a result of lapsing policies, do not require an accounting.  Civil penalties are easily calculable, any punitive damages award would not be tied to the details of the defendants' financial records, and only Plaintiff is in a position to estimate damages incurred by lapsing policies.  Accordingly, the Court dismisses without prejudice Plaintiff's claim for an accounting.  <u>See</u> <u>Robinson v. Bank of America</u>, 12cv00494, 2012 WL 1932842, at *10 (N.D. Cal. May 29, 2012) (dismissing claim for accounting without prejudice because "plaintiff has clearly identified the specific amount he believes he is owed by defendants").

1    I.      Rule 12(f) relief

2

3            **Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot,**

4    **Volsteadt, Willis, Yolton, Fletcher, and Almeida** request that the Court strike certain terms

5    in the AC.  Specifically, they request that the Court order Plaintiff to remove the word

6    "wrongful," the phrase "wrongful commission scheme," allegations concerning "secret loans,"

7    and allegations concerning the subjective state of mind of third party policyholders.  The

8    Court finds none of these words, terms, or allegations sufficiently "redundant, immaterial,

9    impertinent, or scandalous" to justify striking them from the Complaint.  See Fed. R. Civ. P.

10   12(f).

11           **Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar** move to strike

12   Plaintiff's request for an injunction, pursuant to Plaintiff's UCL cause of action prohibiting

13   them from perpetrating future wrongful commissions schemes against other insurance

14   companies.  (See AC ¶ 72.)  These defendants argue that "defendants' relationships with

15   other insurers does 'not pertain' to the issues in this case."  (Doc. 43-2 at 2 (citing

16   Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 974 (9th Cir. 2010)).)  They further contend

17   that "Plaintiff has not, and cannot, establish that it has or will suffer any 'injury-in-fact' as a

18   result of defendants' sales activities on behalf of others."  (Id. at 3 (citing Lujan v. Defenders

19   of Wildlife, 504 U.S. 555, 560-61 (1992)).)  Plaintiff responds that wrongful commission

20   schemes perpetrated against other life insurance providers affect Plaintiff because "the

21   resulting lost commissions and lapsing policies affect the ability of the life insurance industry

22   (as well as Minnesota Life) to price, fund and maintain their life insurance products."  (Doc.

23   50 at 5.)

24           Although a motion to strike is an unusual posture in which to raise a standing

25   challenge, the Court grants Defendants Scott Pearlman, Stan Pearlman, and Nissim Najjar's

26   motion to strike.  To establish standing under the UCL, a plaintiff must "(1) establish a loss

27   or deprivation of money or property sufficient to qualify as an injury in fact, i.e., *economic*

28   *injury*, and (2) show that the economic injury was the result of, i.e., caused by, the unfair

19

business practice." <u>Kwikset Corp. v. Superior Court</u>, 51 Cal. 4th 310, 322 (2011) (emphasis in original). Plaintiff has not alleged in the AC that an interference with its ability to price life insurance products causes *Plaintiff* any sort of injury, financial or otherwise; rather, in the AC, Minnesota Life frames this interference as an injury to consumers:

> The cost of insurance for those products utilized by the Wrongful Commission Schemes are shifted to those honest policyholders who pay sufficient premiums to maintain their policies in force and, who intend to keep their policies in force, as those products have been designed by insurance companies, such as Minnesota Life. In addition, the Wrongful Commission Schemes deprive honest consumers of fairly priced life insurance products by transferring the expenses associated with underwriting and issuing such products thereby causing honest consumers to pay a higher price for the product than they would have if the Wrongful Commission Schemes had not occurred.

(AC ¶ 28.)   Plaintiff's allegations regarding alleged wrongful commission schemes perpetrated against other insurance companies are not pertinent to its UCL claim, and the Court STRIKES for lack of standing Plaintiff's request for an injunction prohibiting Defendants from perpetrating future wrongful commissions schemes against other insurance companies.

//
//
//
//
//
//
//
//
//
//
//
//
//

### IV.  CONCLUSION

For the reasons set forth above, the Court hereby **ORDERS** the following:

The Court **DENIES** the motion to dismiss filed by Defendants Scott Pearlman, Stan Pearlman, and Najjar (Doc. 42) and the motions to dismiss and to strike filed by Defendants Brooks, Haber, Marketing Partnerships, Inc., Moore, Philpot, Volsteadt, Willis, Yolton, Fletcher, and Almeida (Docs. 47, 67, and 72).

The Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss filed by Defendants Capital Funding Associates, Higa, Wira, Lacape, Equote, and Richard J. Wira and Yvette S. Wira as co-trustees of the Wira Family Trust (Docs. 44 and 46). The Court dismisses Plaintiff's claims for declaratory relief and for an accounting against all Defendants.

The Court **GRANTS** the motion to strike filed by Scott Pearlman, Stan Pearlman, and Nissim Najjar (Doc. 43), and strikes Plaintiff's request for an injunction prohibiting Defendants from perpetrating future wrongful commissions schemes against other insurance companies.

All other claims against Defendants remain.  No motions for reconsideration shall be permitted.  The Defendants shall file an answer by October 19, 2012.

**IT IS SO ORDERED.**

DATED:  September 27, 2012

_Barry Ted Moskowitz_
BARRY TED MOSKOWITZ, Chief Judge
United States District Court

21

11cv00812 BTM (POR)